GATES vs. HUGHES, imp.

(1, 2) EVIDENCE *that notes of former partner were taken in payment of firm debt.*

(3) SURETYSHIP, *and discharge of surety.*

1. Upon the dissolution of a firm, plaintiff received notes of one of the former partners for a firm debt due him. There being conflicting testimony upon the question whether these were taken in *payment* of such debt, or merely as collaterals, the jury were at liberty to determine the question

from *circumstantial* as well as from direct and positive evidence of the fact; and it was error to instruct them that such an agreement could not be "found in the affirmative *by inference,* but must be established by affirmative proof."

2. The amount of the firm property turned over to the maker of said notes upon the dissolution, and his ability to pay plaintiff's demand, were proper facts to be considered by the jury, in connection with others, in determining whether such agreement was made.

3. Where, after dissolution of the firm of A. and B., A. assumes, as between himself and B., payment of a firm debt, and the creditor, with knowledge of that arrangement, accepts notes of A. postponing the time of payment without the assent of B.: *quære,* whether B. is not to be regarded as having been a mere surety for the debt, and as released by the taking of the notes.

APPEAL from the Circuit Court for *Racine* County.

Action against Robert Hughes and *Hugh Hughes* on an alleged indebtedness to plaintiff for goods sold by him to the firm of Hughes Bros. (consisting of these defendants) before its dissolution. Robert Hughes did not answer. The defense set up by *Hugh Hughes* will appear from the opinion. From a judgment against both defendants, *Hugh Hughes* appealed.

*J. T. Fish,* for the appellant, to the point that *when plaintiff was informed* of the arrangement between the former partners, as to the payment of the debt by Robert, *Hugh* became a surety merely, even as between him and the plaintiff, cited *Oakeley v. Pasheller,* 10 Bligh, 558; *Colgrove v. Tallman,* 2 Lans., 97; *S. C.,* 67 N. Y., 95; *Waydell v. Luer,* 3 Denio, 410, and cases cited in opinion of Senator LOTT; *Millerd v. Thorn,* 56 N. Y., 402; *Morss v. Gleason,* 64 id., 204; *Harris v. Newell,* 42 Wis., 687.

For the respondent, a brief was filed by *Geo. B. & A. Cary Judd,* and the cause was argued orally by *Geo. B. Judd.*

ORTON, J.   Robert and *Hugh Hughes* had been copartners in the saloon and grocery business, and, as such, had become indebted to the plaintiff for beer, on account of the saloon, in about the sum of three hundred dollars.   Robert and *Hugh*

dissolved in October, 1874, each agreeing with the other that Robert should retain the saloon property, which was the largest amount of the partnership property, and pay all the debts contracted on account of the saloon, and that *Hugh* should retain the grocery property, and pay the debts contracted in that business.

The answer of *Hugh* sets up that Robert agreed with the plaintiff that the plaintiff should release the firm and take and hold him alone liable for this indebtedness of the firm, in consideration of the agreement that he, Robert, should continue to deal with the plaintiff as the firm theretofore had done, and pay the plaintiff five dollars per month or week on this firm indebtedness so assumed by him; and that, to secure such payment, Robert gave his individual notes to the plaintiff.

It appeared in evidence that the notes so given by Robert were five promissory notes for fifty dollars each, payable monthly to the plaintiff or bearer; that on the first note there had been three payments, in all of about thirty-four dollars; that there had been another note of Robert to the plaintiff, on the same demand, for forty-seven dollars and fifty-five cents, about which the evidence is somewhat obscure, but which had probably been paid; that the copartnership had, for a long time previous to 1874, bought beer for their saloon of the plaintiff, and there had been an open and running account for it between them; that the saloon business with the plaintiff had been principally done with Robert; that at one time, in March, 1874, Robert gave the plaintiff his individual note for $158.25 for the balance of the account then due; that the plaintiff negotiated the note to one Northrop; and that afterwards Robert paid it. The plaintiff says, in relation to the said five notes which he took of Robert, and the said note of $158.25: "It seems I got the first note paid, this would be paid too;" and that, "he accepted (the five notes) as payment of the firm debt, if they were paid;" and that he knew of the arrangement and agreement between Robert and *Hugh*, as to

Robert assuming the saloon debts on their dissolution of the copartnership.

The five notes were negotiable and payable from month to month, and extended the time of the payment of the original debt; and there is no proof, at least, that *Hugh* knew of it, or assented to it.

The defendant Robert Hughes testified, substantially, that he informed the plaintiff of the arrangement between *Hugh* and himself, by which he had assumed to pay his claim against the firm on account of the saloon, and that the plaintiff assented to it, and took the five notes in payment of it. The witness Pugh testified that he had knowledge of the settlement between Robert and *Hugh* on their dissolution, and informed the plaintiff of it; and that the plaintiff said that he had taken the notes of Robert in payment of the claim, and that Robert had made two or three payments on them.

The plaintiff testified that he told Robert, when he took the notes, that " he would take the notes in payment of the company's debt, for their pay, if they were paid in time; " and that he accepted them as payment, if they were paid; and that he knew the arrangement by which Robert had assumed to pay it, but that nothing was said between him and Robert about releasing or discharging *Hugh*.

It was the material and vital question in the case, whether these notes were received by the plaintiff in payment and discharge of the firm debt, and actually discharged *Hugh*. It seems to have been clearly proved by at least two witnesses, Robert Hughes and Pugh, that they were so received, and disproved only by the plaintiff's own testimony, and that not very directly.

Although there may not be such a clear preponderance of evidence as would warrant this court in reversing the ruling of the court below on the motion of the appellant for a new trial upon the minutes of the evidence, and in finding the facts adversely to the finding of the jury upon this question,

yet there is such a conflict as should require this court to scrutinize with some strictness the rulings of that court in the rejection of evidence, and its instructions to the jury bearing upon it. To say what is most favorable to the plaintiff, there was a conflict of evidence as to whether such an agreement was made between Robert Hughes and the plaintiff.

The first instruction given to the jury at the request of plaintiff's counsel was: "The second proposition propounded by the plaintiff cannot be found in the affirmative by inference, but must be established by affirmative proof." The second question propounded by the plaintiff, and referred to in this instruction, was: "Did the plaintiff enter into an agreement with said Robert Hughes, to the effect that said Robert Hughes should continue to deal with said plaintiff on his individual account after the dissolution of said copartnership with *Hugh Hughes*, and that, in consideration thereof, said Robert Hughes should alone be responsible to said plaintiff for the firm debt, and should secure payment thereof by the notes exhibited in evidence?" This question was submitted to the jury on this instruction, for a special finding, and they answered it in the negative.

The circuit court, in this instruction, uses these terms, "affirmative by inference" and "affirmative proof," in contradistinction. What precise idea of the strict meaning of these terms was in the mind of the court, or what the court intended the jury to understand by them, it is impossible to determine. As we understand the first branch of the instruction, it is equivalent to saying that this question cannot be found in the affirmative except upon *direct* and *positive* proof in favor of the affirmative. "Inference" is a deduction or conclusion from facts or propositions known to be true. When the facts themselves are directly attested, the jury may *deduce* or *infer* or *presume* from them the truth or falsity of the main proposition; and the principal question may be thereby determined in the affirmative or in the negative, as the con-

clusion may necessarily follow the attested premises. "In trials of fact, it will generally be found that the *factum probandum* is either directly attested by those who speak from their own actual knowledge of its existence, *or it is to be inferred* from other facts satisfactorily proved." 1 Greenleaf on Ev., § 13; *Commonwealth v. Goodwin*, 14 Gray, 55. This is the true distinction between *direct*, or *positive*, and *circumstantial* evidence. It is not in degree so much as in logical method; and both of these methods of proof are allowed in all cases, and should never be excluded. The instruction took away from the jury all facts and circumstances tending to prove an express contract between the plaintiff and Robert Hughes, in respect to the debt in controversy, and required them to find that such an express contract was made, from *direct* and *positive* testimony only; and it follows that this branch of the instruction was clearly erroneous.

The other branch of this instruction, that the proposition "must be established by affirmative proof," is strictly meaningless; for it is equivalent to saying that the jury must find *affirmatively*, if there is sufficient proof in favor of the affirmative side of the proposition. If it means anything, it means that the proposition must be established by *direct* or *positive* proof, and is consistent with, and in effect a repetition of, the first branch of the instruction above considered, and misled the jury in the same direction and to the same extent; and in this view this branch of the instruction was also erroneous. In *Tyler v. Burrington, Adm'x*, 39 Wis., 376, the chief justice, upon a most able and critical review of the decisions of this court and of other courts upon this question, has given utterance to the distinct and no longer doubtful principle in the law of evidence, that an express contract may " be established by direct and positive evidence or by *circumstantial* evidence equivalent to direct and positive; " and he says, in relation to a passage quoted from the opinion of Chief Justice GIBSON in *Bash v. Bash*, 9 Pa. St., 260: " So far as this passage appears

to exclude circumstantial evidence of an express contract, we do not adopt it." In *Wells v. Perkins*, 43 Wis., 160, the same doctrine is approved.

The amount and value of the property turned over to Robert and left with him on the dissolution of the copartnership, and his ability to pay the demand of the plaintiff, was at least one very important fact having a bearing upon the question of the making of the contract in dispute, and might properly have been considered by the jury, with other facts and circumstances, in determining whether such a contract was actually made, as to which main fact the direct and positive testimony of the parties themselves was in conflict. For this reason, we think the circuit court also erred in sustaining the objection to this question put to the witness Pugh: "Do you know about the amount of property that was turned over to Robert under that agreement?"

We can conceive of no possible reason why the circuit court sustained the objection to the following question put to the same witness: "Do you know how much the amount of indebtedness was, from the firm of Hughes Bros. to *Gates*, at the time of the dissolution?" For the amount of such indebtedness was a part of the main issue in the case, upon which the parties were in disagreement. In this, also, we think the court erred.

Upon the undisputed evidence in the case, was not *Hugh Hughes*, if he was not absolutely discharged, a mere surety for Robert for the payment of the original debt of the firm; and did not the plaintiff, in taking the notes of Robert, and postponing the time of payment, discharge *Hugh Hughes* as such surety? We are strongly inclined to hold that the case comes within the authorities cited by the learned counsel for the appellant, and that such were the legal consequences of the whole transaction.

In *Oakeley v. Pasheller*, 10 Bligh, N. P., 550, the transaction between the copartners on the dissolution of the firm, in

respect to the partnership debt owing to Sir Charles Oakeley, was very similar in terms and effect to that between Robert and *Hugh* in respect to the firm debt due the plaintiff; and, time having been given to those who had assumed the debt, by the creditor, in that case, without the assent of the parties claiming a discharge therefrom, it was held that these parties were *mere sureties* for the others, and were thereby discharged. And *Colgrove v. Tallman*, 67 N. Y., 95, is to the same effect, and in point.

But for the errors above specified, the judgment must be reversed.

*By the Court.*—The judgment of the circuit court is reversed, with costs, and the cause remanded for a new trial.